Filing # 62999373 E-Filed 10/18/2017 02:00:44 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.: 16-2016-CA-002075-XXXX-MA
DIVISION: CV-F

CLAUDIA L. NELSON and
RONALD D. NELSON, her husband,

      Plaintiffs,

v.

LOREN Z. CLAYMAN, M.D.,
LOREN Z. CLAYMAN, M.D., P.A.,
a Florida corporation,
ALLERGAN, INC.,
a foreign corporation,
ALLERGAN SALES, LLC,
a foreign limited liability company, and
ALLERGAN USA, INC.,
a foreign corporation,

      Defendants.

_____/

## COMPLAINT

The Plaintiffs, **CLAUDIA L. NELSON** and **RONALD D. NELSON, her husband,** sue the Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A.,** a Florida corporation, **ALLERGAN, INC.,** a foreign corporation, **ALLERGAN SALES, LLC,** a foreign limited liability company, and **ALLERGAN USA, INC.,** a foreign corporation, and allege the following:

### GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $15,000, exclusive of attorney's fees, costs, and interest.

2.     All conditions precedent to the filing of this action have been performed or have occurred.

3.     At all times material hereto, the Plaintiffs, **CLAUDIA L. NELSON** (hereinafter "Ms. Nelson") and **RONALD D. NELSON** (hereinafter "Mr. Nelson"), were and are residents of, and permanently domiciled in, the State of Florida.

4.     At all times material hereto, the Defendant **LOREN Z. CLAYMAN, M.D.** (hereinafter "Loren Z. Clayman") was and is a resident of Jacksonville, Duval County, Florida.

5.     At all times material hereto, Loren Z. Clayman was and is a physician licensed to practice medicine by the State of Florida, who was and is practicing medicine in Duval County, Florida at his principal place of business located at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

6.     All medical care and treatment rendered to **CLAUDIA L. NELSON** upon which the claims set forth herein are based took place in Jacksonville, Duval County, Florida.

7.     At all times material hereto, Loren Z. Clayman held himself out as a specialist in the area of plastic surgery.

8.     At all times material hereto, the Defendant **LOREN Z. CLAYMAN, M.D., P.A.** (hereinafter "Clayman PA") was and is a Florida corporation, with its principal place of business at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

9.     At all times material hereto, Loren Z. Clayman was and is an employee, agent or apparent agent of Clayman PA; at all times material hereto, Loren Z. Clayman was acting in the course and scope of his employment, agency or apparent agency with Clayman PA.

10.  The Defendant **ALLERGAN, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

11.  The Defendant **ALLERGAN, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

12.  The Defendant **ALLERGAN, INC.** may be reached for service of process in the State of Florida through its registered agent, CT Corporation System at 1201 Hays Street, Suite 105, Tallahassee, Florida 32301.

13.  The Defendant **ALLERGAN SALES, LLC** is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

14.  The Defendant **ALLERGAN SALES, LLC** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

15.  The Defendant **ALLERGAN SALES, LLC** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island

Road, Plantation, Florida 33324.

16.    The Defendant **ALLERGAN USA, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

17.    The Defendant **ALLERGAN USA, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

18.    The Defendant **ALLERGAN USA, INC.** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

19.    The Defendants **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.** are hereinafter collectively referred to as "Allergan."

## PROCEDURAL ALLEGATIONS

20.    Pursuant to an agreement executed by the attorney for Loren Z. Clayman and Clayman P.A. on February 22, 2017, and by the attorney for Mr. and Mrs. Nelson on April 7, 2017, Mr. and Mrs. Nelson have complied with all conditions precedent and pre-suit requirements for the filing of the instant lawsuit.

4

## FACTUAL ALLEGATIONS

### Allergan's Natrelle Saline Filled Breast Implants

21.     In 1962, two Texas plastic surgeons performed the first breast augmentation surgery using silicone gel filled implants. In 1963, Dow Corning began manufacturing silicone gel filled breast implants based upon the Texas doctors' designs.

22.     Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants. In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

23.     In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed. The new company's breast implants were still labeled McGhan breast implants. By this time the company was one of the largest breast implant manufacturers in the world.

24.     As a result of emerging safety concerns, in 1988 the United States Food and Drug Administration (FDA) re-classified silicone gel filled breast implants as Class III medical devices, which then required breast implant manufacturers to submit Pre-Market Approval (PMA) applications to the FDA to prove by valid scientific data that their respective implants were safe and effective.

25.     After reviewing the PMA applications of the different silicone breast implant manufacturers (including those of Inamed/McGhan), in 1992 the FDA prohibited the sale of silicone breast implants.

26.     In 1994, a $4 billion class action lawsuit over silicone filled breast implants was settled. Inamed contributed approximately $32,000,000 toward the settlement.

27.    In 1998, Inamed removed and replaced Donald K. McGhan from his position as chairman and chief executive of the company.[1]

28.    On November 16, 1999, Inamed filed a PMA for the "McGhan Medical RTV Saline-Filled Breast Implant," later known as the "Natrelle Saline-Filled Breast Implant." On May 10, 2000, the FDA issued a letter approving the PMA.

29.    In March of 2006, Inamed merged with Allergan, Inc., a company that makes products for eye care, neuroscience and dermatology, including its best known product, Botox, the injectable wrinkle treatment. Afterward, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

30.    On November 17, 2006, the FDA approved PMA's from both Allergan and Mentor (Allergan's main U.S. competitor in the design and manufacture of breast implants) for new silicone filled breast implants.

31.    On February 20, 2013, the FDA approved Allergan, Inc.'s PMA for the Natrelle 410, anatomically shaped highly cohesive silicone gel-filled breast implants, a type of breast implants that are commonly referred to as "gummy bear" implants. The new implants were softer, more cohesive, and more anatomically shaped than saline filled implants.

32.    In the last several years, silicone gel-filled implants have become the most commonly used types of breast implants in the U.S.

33.    With all Natrelle breast implants, Inamed/Allergan included its "ConfidencePlus Warranty." According to the ConfidencePlus warranty literature provided by Allergan, the warranty program applied to all FDA-approved Natrelle breast implants, provided the implants were used:

---

[1]    McGhan is currently serving the remainder of a 10-year prison sentence in Texas for wire fraud in relation to a scheme in which he attempted to use real estate investors' money for another breast implant business.

6

- As intended by appropriately qualified and licensed surgeons, in accordance with current and accepted plastic surgery techniques
- In accordance with the current *Natrelle* Breast Implant Directions for Use, found at www.allergan.com/labeling/usa.htm.

However, the warranty only applied to cases of:

- Loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention
- Capsular contracture (Baker Grade III/IV) with *Natrelle* Gel implants that requires surgical intervention

34.     Under Allergan's *ConfidencePlus Warranty Matrix*, the Standard warranty comes with Natrelle implants free of additional cost, while the Premier warranty cost an additional $100 until 2014, and $200 thereafter; both warranties have terms of coverage of 10 years. The Standard warranty provides for a lifetime replacement of the ruptured implant, replacement of the contralateral implant (for 10 years)[2], and $1,200 for the cost of replacement/revision surgery. The Premier warranty provides for lifetime replacement of both the ruptured and contralateral implants, plus $2,400 for the cost of replacement/revision surgery.

**Clayman Defendants**

35.     Loren Z. Clayman was first licensed as a medical doctor in the State of Florida on January 10, 1975. On December 31, 1976, he completed a residency in plastic surgery, and he began practicing plastic surgery soon afterward in Jacksonville, Florida. On October 2, 1978, he filed articles of incorporation for Clayman PA, with himself listed as both President and the Registered Agent of the new corporation.

---

[2]     At first, only Natrelle Style 163 saline filled implants had lifetime replacement for contralateral breast implants; other Natrelle saline filled implants had only a 10 year warranty for contralateral implants. Beginning June 1, 2009, the Standard warranty was changed to provide for the lifetime replacement of contralateral breast implants for all Natrelle saline filled implants.

7

36.     Loren Z. Clayman began performing breast augmentation surgeries as part of his plastic surgery practice.   During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

37.     After the FDA prohibited the sale of most silicone implants in 1992, Loren Z. Clayman began using saline filled implants almost exclusively.[3]

38.     By 2000, Loren Z. Clayman purchased at least a portion of the saline filled breast implants he used in augmentation procedures from Inamed/McGhan (later Allergan).   The majority (if not all) of saline filled breast implants he purchased from Inamed/McGhan were Natrelle saline filled breast implants.

39.     Before Ms. Nelson first consulted with Loren Z. Clayman regarding breast augmentation in 2005, he began making a higher than average number of warranty claims for patients with saline filled implants.   In the vast majority of these claims, Loren Z. Clayman and/or Clayman PA alleged that one or more saline implants spontaneously ruptured/deflated through no fault of the patient or himself.   Furthermore, Loren Z. Clayman and/or Clayman PA began making multiple, successive warranty claims for many of his/their patients.   This practice of Loren Z. Clayman and/or Clayman PA continued during the course of treatment of Ms. Nelson.

40.     Even after the FDA once again permitted the sale of silicone filled breast implants in 2006, Loren Z. Clayman and/or Clayman PA continued using saline filled breast implants almost exclusively for breast augmentation procedures.

41.     After June 30, 2008, Loren Z. Clayman's son, Mark Clayman, joined Clayman PA and began practicing plastic surgery, including performing breast augmentation procedures.

---

[3]     Silicone filled breast implants could only be used for patients participating in ongoing medical studies, although it is unknown whether any of Loren Z. Clayman's patients participated in the studies.

For patients who received saline filled breast implants, Mark Clayman through Clayman PA also began making a higher than average number of warranty claims in which he alleged spontaneous ruptures/deflations through no fault of the patient or him. Likewise, in many instances, Mark Clayman through Clayman PA made multiple, successive warranty claims for patients, and he rarely, if ever, used silicone filled implants for breast augmentation procedures.

42.      **Between 2001 and 2015, Clayman PA made warranty claims to Allergan for more than 5,516 pairs of Natrelle saline filled breast implants.**

43.      According to Allergan's follow up studies for Natrelle saline filled implants, the rate of spontaneous deflations is approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.

44.      Pursuant to 21 C.F.R. §§ 814.80 and 814.82, Allergan has a continuing obligation to evaluate the "safety, effectiveness, and reliability" of medical devices such as Allergan Natrelle saline filled breast implants. In accordance with these requirements, Allergan performs a "*Laboratory Analysis*" of each returned breast implant to determine the cause of an alleged rupture/deflation, after which a report is generated and maintained. For the overwhelming majority of saline filled breast implants returned by Clayman PA to Allergan, Allergan found no identifiable causes for the claimed spontaneous ruptures/deflations.

45.      Nevertheless, to the best of the undersigned's knowledge and belief, Allergan paid every one of Clayman PA's warranty claims between 2001 and 2015.

9

## CLAUDIA L. NELSON

46.      Ms. Claudia L. Nelson initially sought a consultation for breast augmentation and obtained a bilateral silicone augmentation mammoplasty in 1982 by Loren Z. Clayman.  These implants seemed to be working well and she was cup size C.

47.      Ms. Nelson returned to Loren Z. Clayman's office on August 22, 2005.  Her breasts were starting to sag and there was some concern that the silicone implants may have been leaking.

48.      Loren Z. Clayman walked into the exam room without a chaperone and said, "why are you here sweetie?"  Ms. Nelson told him that her primary care physician was concerned about the implants leaking.  Loren Z. Clayman said, "ok, honey, take off your shirt and bra and show me your tits."  She was not given a drape.  He did not put on gloves but told her to face the mirrors.  He came up behind her and grabbed her breasts and started pushing them up and down.  He then cupped them to feel.  He said this was to feel for leaks.

49.      Loren Z. Clayman then told her that the implants needed to come out.  He would go through the areola this time to lift them.  Ms. Nelson asked about just removing the implants and doing a lift but Loren Z. Clayman insisted that it would leave ugly scars.  He claimed he could put in saline implants with an internal lift and that would do the same as a regular lift, without the ugly scars.

50.      Loren Z. Clayman never measured her breasts but Ms. Nelson told him that she wanted them to be the same size.  The only note from the visit states, "Patient had silicone augmentation mammoplasty in 1982.  Recent mammogram showed possible rupture.  All options are discussed. Schedule bilateral removal and replacement with saline implants and crescentpexy on 10/12/05."  A surgery cost estimate form indicated a proposal to perform remove the existing

10

implants and replace with saline implants. A bilateral crescentpexy was also to be performed all for a total cost of $4,000.

51.    There no other details of the initial visit given. Specifically, there is no record of a discussion with her regarding her objectives, the possible alternatives, and counseling with regard to her condition. The medical records also fail to document any detailed description of her current complaints, her desired goal, her family history, her past medical history, her past surgical history, or the medications she was taking. There is also no documented physical examination including dimensional assessment of Ms. Nelson's breasts, nor is there a discussion of possible approaches, type or size of implants to be used, or how he intended to address her concerns. Loren Z. Clayman simply promised her that he would give her the results she wanted.

52.    Unbeknownst to Ms. Nelson, Loren Z. Clayman and Clayman PA had a specific financial incentive to push saline implants on their patients, including Ms. Nelson, even when the patient specifically expressed a desire for silicone implants. Loren Z. Clayman, and Clayman PA had engaged in a scheme with Allergan, the manufacturer of the saline implants, that they could claim a defect in the saline implants and replace them for their direct financial benefit when no such defect existed. Moreover, Loren Clayman would claim defect of the saline implants and replace them in order to cover up his inadequate surgical skills or haste in performing surgeries on his patients.

53.    Ms. Nelson returned to Loren Z. Clayman's office for surgery on October 12, 2005. There is no documented physical examination prior to the surgery, specifically no documented dimensional assessment of Ms. Nelson's breasts or any physical findings whatsoever. The History and Physical form in Loren Z. Clayman's chart contains only one mark that purports to be that of Loren Z. Clayman, a single line in the "normal" column of the list of

systems. In fact, Loren Z. Clayman did not perform a physical examination and Ms. Nelson did not see Loren Z. Clayman before surgery at all.

54. The only indication regarding her concerns and goals was the note that recognized that she wanted size "34 D – no larger!" There is no indication that the option(s) for resolving her complaints were considered or discussed with the patient. No ultimate plan was apparently discussed or recorded.

55. The single preoperative photograph of Claudia L. Nelson taken by Loren Z. Clayman or his staff dated October 12, 2005 is only a frontal view. Moreover, this frontal view is not in the correct plane to be a true frontal view. In this photograph, however, she demonstrates significant ptosis (sagging) as well as minor asymmetry in orientation and volume. There is no record or indication that any of these conditions were appreciated by Loren Z. Clayman or discussed with the patient.

56. Claudia L. Nelson underwent breast augmentation surgery by Loren Z. Clayman on October 12, 2005. The Operative Report indicates that Loren Z. Clayman cut into the breasts by making a crescent incision. He then recorded making "appropriate excisions" in the areola. The right implant was found intact and removed. A McGhan Style 68 High Profile 350 cc saline implant was inserted into the right breast. The left implant was found to be ruptured within the pocket and removed. The same 350 cc implant was then inserted into the left breast.

57. The Operative Report does not record the amount of saline that was used to fill the implants. In fact, Loren Z. Clayman failed to measure the amount of saline that was used and overfilled the implants. Loren Z. Clayman failed to assess the patient's breasts for symmetry intraoperatively.

58.    Loren Z. Clayman failed to create or maintain an anesthesia record. However, the patient was put under intravenous sedation with Valium, Demerol, and Ketamine administered by a registered nurse. During the middle of the surgery Ms. Nelson could hear Loren Z. Clayman and his staff talking. She tried to speak but it was just a mumble. She could feel the tugging and pulling as well as a burning hurt feeling. She heard Loren Z. Clayman yell to, "put her under more." She did not see Loren Z. Clayman after the surgery.

59.    Ms. Nelson returned to Loren Z. Clayman's office on October 19, 2005 for post-operative follow up. She did not see Loren Z. Clayman at all but a nurse. She told the nurse that she was in a lot of pain and that there was some oozing from her left breast. The nurse reassured her that it was normal. She was given something for pain and told to follow up in a week to have her stitches removed. The only note for the visit states, "Pt. seen and re-taped above incision. R.T.O. 1 Wed." It is unclear who documented this note but there was no documentation of a physical examination, no indication how the patient was doing and no record whether the patient's concerns were addressed or even recognized.

60.    Ms. Nelson returned to Loren Z. Clayman's office again on October 26, 2005. There is no patient questionnaire and no record of the patient's subjective assessment. Loren Z. Clayman walked into the room and said, "what's up baby?" He was eating something and said, "baby take off your shirt so I can see what's up." He did not wash his hands but picked up a pair of scissors and tweezers and pulled out the stitches. She questioned him by they were bigger than she wanted and that they were not the same size. She was reassured that they were just swollen and they had to settle down." The only note for the visit states, "Removed sutures of nipples. R.T.O. P.R.N." It is unclear who documented this note but there was no documentation of a physical examination by a physician, no indication how the patient was doing and no record

13

of the patient's subjective assessment. There is no recordation that Ms. Nelson was even seen by a physician that day.

61.     On December 8, 2005, Claudia L. Nelson returned to Loren Z. Clayman's office again reiterating her concern about their size. In addition, the right breast was very swollen and hard. Ms. Nelson did not see Loren Z. Clayman at all but just the nurse. The nurse merely told her to use warm compresses. The chart merely indicates "Patient is experiencing mondas (?) on the right side, advised to use warm compresses. Sch. scar revision and increase of saline to left breast, sch. 12/20/05." The author of this note is unknown but there was no documentation of a physical examination by a physician, no recorded description or assessment of the size disparity, no indication of a discussion with the patient regarding treatment options or alternatives, and no recorded plan of care. There is a separate surgery cost estimate form that indicates that a scar revision and an increase left breast will be performed at no charge to the patient.

62.     Ms. Nelson returned for her first breast surgery revision on December 20, 2005. There is no documented physical examination prior to the surgery, specifically no documented dimensional assessment of Ms. Nelson's breasts and no physical findings whatsoever. The patient's assessment was simply that she was there due to size and for a scar revision. She expressed her goal to be a "full C" size rather than the size DD that she was. The Authorization for and Consent to Surgery is completely blank regarding the surgery to be performed.

63.     The History and Physical form in Loren Z. Clayman's chart contains only one entry that purports to be by Loren Z. Clayman, a single line in the normal column of the list of systems. There is no description of the patient's anatomy and no photographic documentation of her condition.

14

64.     According to the Operative Report dated December 20, 2005 Loren Z. Clayman cut into the areola on the right side and made an excision. He then cut into the left breast and an "increase of saline inflation was carried out appropriately." Loren Z. Clayman failed to measure the amount of additional saline that was added to the unmeasured amount that he had initially used to inflate the implant. Instead of making the breasts smaller as requested by Ms. Nelson, Loren Z. Clayman made the left breast even larger and did nothing to change the size of the right breast. Ms. Nelson went from a DD cup to a size DDD cup, even though she had requested a size C cup. Moreover, Loren Z. Clayman failed to assess the breasts for symmetry intra-operatively.

65.     Although Loren Z. Clayman's chart claims that there was a 48 hour post operative visit, there was no such visit. Ms. Nelson did not return to Loren Z. Clayman's office until December 27, 2005, seven days later. There is no recorded subjective assessment of the patient. In fact, the patient was surprised that her breasts were larger; larger than before and much larger than she desired, a cup size DDD. The only note for the visit states, "Pt. seen and removed sutures and taped. R.T.O. P.R.N." It is unclear who documented this note but there was no documentation of a physical examination by a physician, no indication how the patient was doing and no subjective assessment by the patient. There is no recordation in the medical chart that Ms. Nelson was even seen by a physician that day.

66.     Ms. Nelson returned to Loren Z. Clayman's office again on May 21, 2010. She again complained about the size of her breasts. Loren Z. Clayman walked in and told Ms. Nelson a dirty joke and then asked, "so, what are you doing here baby?" She told him that her breasts were way too big and they were also uneven. One was noticeably bigger and lower than the other. She complained that her back and neck hurt and that she was getting indents in her

15

shoulders where her bra strap was.   He also told them that they sagged.  She asked him to take out the implants, do a reduction and a left.  Loren Z. Clayman again told her that is not what she needed and that he would take good care of her.  He promised her that he would do a small internal reduction and put in smaller implants.  He told her that the smaller implants would help with the settling.

67.    On May 21, 2010, Loren Z. Clayman told her to take off her shirt so that he could see her "tits."  He again came behind her and cupped her breasts.  He told her that there would be no problem going in the same way, through the areola.  He also told her that one or both of them were leaking and that replacing them was her only option.  He made it sound like this was a normal occurrence.  The only note for the visit states, "pt seen for deflation had consult for face lift pt will call to schedule."

68.    It is unclear who documented the note of May 21, 2010 but there was no documentation of a physical examination by a physician, no indication how the patient was doing and no indication whether the options for addressing the patient's concerns were discussed or considered.  There is no recordation in the medical chart that Ms. Nelson was even seen by a physician that day.  There is a separate surgery cost estimate form dated May 21, 2010 that indicates that a bilateral replacement will be performed to address a "left deflation" at no cost to the patient since the "co. will supply."  Loren Z. Clayman was also to do a front face and high temple lift for $2,000.  There are also notations to "replace small order 330 HP" and that an "areola reduction" would also be done at no charge.

69.    Ms. Nelson returned on July 13, 2010 for her third breast surgery by Loren Z. Clayman. The patient questionnaire for the day of surgery indicates the following concerns:

- "breast size & sag"

16

- "Face sag"

She emphasized to the nurse to make sure she got a breast size C and received a lift. There is no record that Loren Z. Clayman discussed her goals or objectives prior to surgery. There is no indication that Loren Z. Clayman ever provided appropriate counseling regarding the size or structure of her breasts, the asymmetry, sagging, or position of her breasts, or answered any of her questions or addressed her concerns. In fact, Ms. Nelson did not see Loren Z. Clayman at all before surgey.

70.    On July 13, 2010 Loren Z. Clayman had Ms. Nelson sign an Authorization for and Consent to Surgery or Therapeutic Procedures which specifically listed "left Deflation Bilateral Replace." However, Ms. Nelson did not have a left deflation.

71.    There is no documented physical examination prior to the surgery of July 13, 2010, specifically no documented dimensional assessment of Ms. Nelson's breasts and no physical findings whatsoever. The History and Physical form in Loren Z. Clayman's chart contains only one mark that purports to be that of Loren Z. Clayman, a single arrow in the "normal" column of the list of systems. The History and Physical only recognizes one of her goals, to decrease the size, by noting: "EE → C."

72.    Loren Z. Clayman listed "Left deflation" as his preoperative diagnosis in the Operative Report and in the OR Record. However, the preoperative photograph in Loren Z. Clayman's chart dated 7-13-10 does not show any evidence of deflation of either implant. Instead, the preoperative photograph demonstrated that the breasts were malpositioned and asymmetrical, the areolas had significantly widened and the sagging due to their large size was pronounced.

17

73.    Loren Z. Clayman proceeded with the third breast surgery on Claudia L. Nelson on July 13, 2010 purportedly utilizing the previous areola incisions. Loren Z. Clayman first cut into the left breast areola. He recorded that the left "implant was found to have a partial deflation and was removed." The OR Record states: "left: leak @ valve." The right implant was found intact but removed anyway.

74.    Loren Z. Clayman replaced the prior 350 cc High Profile saline implants with Allergan Natrelle Style 68 High Profile 320 cc implants. Although the implants were slightly smaller, the smaller size was insufficient to reduce the patient from size EE to size C. There is no indication in the Operative Report as to the amount of saline infused into either implant. Instead, Loren Z. Clayman stated simply that they were filled with saline. In fact, Loren Z. Clayman failed to measure the amount of saline used and overfilled the saline implants. Further, Loren Z. Clayman failed to assess the results for symmetry intraoperatively. He then made additional cuts into the areola and removed tissue. A face and temple lift was also performed. The patient was put under intravenous sedation by a registered nurse with Ketamine, Valium, Decadron, and Versed.

75.    Loren Z. Clayman reported the left implant to be defective to Allergan prior to the surgery, without any actual evidence of defect and before he had the opportunity to inspect the implant intraoperatively.[4]  Loren Z. Clayman had Claudia L. Nelson sign the claim form before the surgery was performed, so that Loren Z. Clayman could be paid. Loren Z. Clayman subsequently filed a warranty claim to Allergan for the right implant that he removed on July 13, 2010. In the paperwork he completed and sent to Allergan, Loren Z. Clayman reported that there

---

[4] The Returned Goods Authorization (RGA) Checklist for Saline Devices (the claim form) was dated July 12, 2010, the day before surgery and received in Loren Z. Clayman's office via facsimile on that same day.

was a "[h]ole in valve." [5]    After examining the returned left implant, Allergan documented in a *Laboratory Analysis* report that there were no findings to substantiate a spontaneous saline implant deflation. Specifically, the Laboratory Analysis found,

> White particles were observed on the inner surface of the implant. White particles were observed on the outer surface of the implant. The analysis identified no openings in the implant shell. Valve functioning was satisfactory.

Despite this, Allergan paid Loren Z. Clayman and Clayman PA the sum of $1,200 for the surgery of July 13, 2010.

76.    Ms. Nelson apparently returned for follow up the next day, July 14, 2010. There is no record of the patient's subjective assessment and no record of the visit whatsoever by Loren Z. Clayman or his staff.

77.    Ms. Nelson returned for postoperative follow up on July 16, 2010. The patient questionnaire indicates that Ms. Nelson had questions regarding the surgery including size and swelling. However, her questions were not documented. In fact, although Ms. Nelson had specifically requested a significant size reduction (from EE to C), her breasts were DDD size, still much much larger than she requested. The chart merely indicates, "pt seen for post op check & dressing changed pt will RTO Wed." The author of this note is unknown but there was no documentation of a physical examination by a physician and no indication how the patient was doing. There is no record that Ms. Nelson's questions were answered, her concerns about swelling were recognized, or that she was even seen by a physician that day.

78.    On July 21, 2010, Claudia L. Nelson returned to Loren Z. Clayman's office again for follow up. Again, she had questions. Again, Loren Z. Clayman failed to document the questions. The chart merely indicates "Post-op re-check, DUW, instructions given on care.

---

[5] This was the same defect Loren Z. Clayman reported in virtually every warranty claim submitted to Allergan.

RTO for sutures next week." The author of this note is unknown. There was no documentation of a physical examination by a physician and no indication how the patient was doing. There is no record that Ms. Nelson's questions were answered or that she was even seen by a physician that day. In fact, she was not seen by Loren Z. Clayman at all.

79.    Claudia L. Nelson returned to Loren Z. Clayman's office again for follow up on July 28, 2010. Again, she had questions. The questions related to concerns about her breasts and nipples. Again, Loren Z. Clayman failed to document the questions. The chart merely indicates "Suture removal from breast remaining stapes removed pt will RTO early next week." The author of this note is unknown. There was no documentation of a physical examination by a physician and no indication how the patient was doing. There is no record that Ms. Nelson's questions were answered or that she was even seen by a physician that day

80.    On August 3, 2010, Claudia L. Nelson returned to Loren Z. Clayman's office again for follow up. She had questions regarding breast care. Again, Loren Z. Clayman failed to document the questions. The chart merely indicates "follow up visit pt doing great! Pt will RTO prn." The author of this note is unknown. There was no documentation of a physical examination by a physician and no real indication how the patient was doing. There is no record that Ms. Nelson's questions were answered or that she was even seen by a physician that day

81.    On August 19, 2010, Claudia L. Nelson returned to Loren Z. Clayman's office. Her right breast was noticeably larger than her left breast. Loren Z. Clayman or his staff failed to document the visit at all. Specifically, there was no documentation of a physical examination by a physician and no indication how the patient was doing. There is no record that Ms. Nelson's concern was recognized or that she was even seen by a physician that day. There is a surgery

20

cost estimate form that indicates that, "left smaller" and that a bilateral replacement and circle-pexy would be performed at no charge to the patient.

82.    On August 30, 2012 and January 15, 2013 Ms. Nelson underwent Botox injections. In the January 15, 2013 note it indicates, "recheck on breast pt doing great." There is no mention that Loren Z. Clayman or Clayman PA had recommended bilateral replacement on August 19, 2010 and that Ms. Nelson's breasts were not even. In fact, Ms. Nelson was not happy with the size and weight of the implants and the fact that one was bigger than the other. When Loren Z. Clayman came into the room he cussed several times and made racial jokes. He then said, "baby, take off your shirt so I can see your tits." He came up behind her and grabbed her breasts. Loren Z. Clayman told her they were leaking again and that another surgery had to be performed to replace them. Ms. Nelson told him that she just wanted them taken out since they leak so much and just to give her a reduction and lift. Loren Z. Clayman insisted that a lift would cause very ugly scars and told her that he would replace the implants and do a small lift.

83.    Claudia L. Nelson returned on June 3, 2013 for her fourth breast surgery by Loren Z. Clayman. There was no detailed patient questionnaire. However, she was again emphatic that she wanted smaller breasts. She told the nurse that the implants were being removed and new implants would not be put back in. She recorded that she wanted to reduce from size DDD to "small C." There is no record that Loren Z. Clayman discussed the patient's goals or objectives prior to surgery. There is no indication that Loren Z. Clayman ever provided appropriate counseling regarding the size or structure of her breasts or their asymmetry.

84.    There is no documented physical examination prior to the surgery of June 3, 2013, specifically no documented dimensional assessment of Ms. Nelson's breasts and no physical findings whatsoever. The History and Physical form in Loren Z. Clayman's chart

21

contains only one mark that purports to be that of Loren Z. Clayman, a single arrow in the "normal" column of the list of systems. In fact, Loren Z. Clayman did not see the patient at all before the surgery. The nurse recorded the patient's goal in the History and Physical as "DDD → small C."

85.     Loren Z. Clayman listed "Left deflation" as his preoperative diagnosis in the Operative Report and OR Record. However, the preoperative Polaroid photograph in Loren Z. Clayman's chart dated 6-3-13 does not indicate deflation of either implant. Despite this, Loren Z. Clayman had the patient sign an Authorization for and Consent to Surgery on June 3, 2013 stating that the patient had a left deflation and required a bilateral replacement before Loren Z. Clayman had the opportunity to see and inspect the implant intraoperatively. Instead, the preoperative photograph shows that both breasts are extremely large and malpositioned.

86.     Loren Z. Clayman proceeded with Mr. Nelson's fourth breast surgery on June 3, 2013 by cutting into the left breast through the previous incision. Loren Z. Clayman recorded that, "[t]he implant was found to have deflation (tissue/leak @ valve) and removed." The OR Record states, "Lt. tissue in valve." The right implant was found intact but removed nonetheless.

87.     Loren Z. Clayman replaced the 320 cc High Profile saline implants with 270 cc Moderate Profile saline implants. There is no indication in the Operative Report as to the amount of saline infused into either implant. In fact, Loren Z. Clayman failed to measure the amount of saline used to inflate the implants and overfilled them. He then recorded that he marked the breast skin bilaterally and removed tissue without any specific explanation. The patient was put under intravenous sedation by a registered nurse with Ketamine, Demerol, and Versed.

22

88.    Loren Z. Clayman reported the left implant to be defective to Allergan prior to the surgery, without any actual evidence of defect and before he had the opportunity to inspect the implant intraoperatively.[6]    Loren Z. Clayman had Claudia L. Nelson sign the claim form before the surgery was performed, so that Loren Z. Clayman could be paid.    Loren Z. Clayman subsequently filed a warranty claim to Allergan for the left implant that he removed on June 3, 2013.  In the paperwork he completed and sent to Allergan, Loren Z. Clayman reported that there were "[p]articles in valve." [7]    After examining the returned left implant, Allergan documented in a *Laboratory Analysis* report that there were no findings to substantiate a spontaneous saline implant deflation.  Specifically, the Laboratory Analysis found,

> White and brown particles were observed on the inner surface of the implant.  White particles were observed on the outer surface of the implant.  Brown particles were observed in the fill channel.  Valve functioning was satisfactory.  The analysis identified no openings in the implant.

Despite this, Allergan paid Loren Z. Clayman and Clayman PA the sum of $2,400 for the surgery of June 3, 2013.

89.    After the surgery Ms. Nelson noted that Loren Z. Clayman had cut around the entire nipple and down the breast as well as under the breast on both sides.  Indeed, he had given her the same scar that he advised against because it was ugly and failed to record it in the Operative Report.  Instead of a size C, she was still size DDD.  Ms. Nelson also noted a cut had been made into her abdomen and wondered what that was.

90.    It appears that Ms. Nelson first postoperative follow up by Loren Z. Clayman was on June 5, 2013.  There is no patient questionnaire and no indication of the patient's subjective

---

[6] The Returned Goods Authorization (RGA) Checklist for Saline Devices (the claim form) was dated May 30, 2013, three (3) days before surgery and received in Loren Z. Clayman's office via facsimile on that same day.

[7] These were the same defects Loren Z. Clayman reported in virtually every warranty claim submitted to Allergan.

condition. The only note for the visit states, "Pt. seen for 102.8 temp. Given shot of B-12 & antibiotic given. Call Dr. @ 11:00." It is unclear who documented this note but there was no documentation of a physical examination by a physician. In fact, Loren Z. Clayman did not see the patient on this visit.

91. On June 7, 2013, Claudia L. Nelson returned to Loren Z. Clayman's office. Again, there is no patient questionnaire and the chart merely indicates "Pt. seen, doing well. B-12 given. R.T.O. 1wk." The author of this note is unknown but there was no documentation of a physical examination by a physician, no real indication how the patient was doing and no apparent differential diagnosis of the cause of her condition. There are no notes by Loren Z. Clayman or even any indication that Ms. Nelson was seen by a physician that day. In fact, she was not.

92. On June 12, 2013, Claudia L. Nelson returned to Loren Z. Clayman's office. this was the first time she had seen him since before the surgery. Ms. Nelson asked him directly why he put the implants back in and he said, "I wasn't able to get the breast just right because of the leaks so I had to put an implant back in." Loren Z. Clayman told her that he had awakened her during the surgery and she said that it would be ok to put the implants in. She then asked him what the cut was on her abdomen. He told her that, since it did not go as planned, that he had asked her if she would like a small tummy tuck and that she had said yes. Ms. Nelson told him that she didn't remember any of that. Again, there is no patient questionnaire and the chart merely indicates "Pt. sutures out, taped. R.T.O. P.R.N." The author of this note is unknown but there was no documentation of a physical examination by a physician and no indication how the patient was doing. There are no notes by Loren Z. Clayman or even any indication that Ms. Nelson was seen by a physician that day.

93.    On July 11, 2013, Claudia L. Nelson returned to Loren Z. Clayman's office. Again, there is no patient questionnaire and the chart merely indicates "Pt seen today for 6 week follow-up, DUW. RTO after the summer." The author of this note is unknown but there was no documentation of a physical examination by a physician and no indication how the patient was doing. There are no notes by Loren Z. Clayman or even any indication that Ms. Nelson was seen by a physician that day.

94.    On August 19, 2013, Claudia L. Nelson returned to Loren Z. Clayman's office with complaints about her breasts. She was very dissatisfied with the size and shape of her breasts. One was bigger than the other. She also complained about the weight associated with the large breasts and how much back pain it caused. She again told him that she just wanted them out. Again, there is no patient questionnaire and the chart merely indicates "Pt. seen today with left implant smaller, recommended bilateral replacement, circle-pexy. WCB to schedule." The author of this note is unknown but there was no documentation of a physical examination by a physician, no indication how the patient was doing and no apparent differential diagnosis of the cause of her condition. Loren Z. Clayman told her that they were leaking again. There are no notes by Loren Z. Clayman or even any indication that Ms. Nelson was seen by a physician that day.

95.    On September 3, 2013, Claudia L. Nelson returned to Loren Z. Clayman's office purportedly for a pre-operative consultation. Again, there is no patient questionnaire and the chart merely indicates "Pre-op consultation, sch. 9/23/13." The author of this note is unknown but there was no documentation of a physical examination by a physician, no indication how the patient was doing and no apparent differential diagnosis of the cause of her condition. There is no indication what was discussed, the patient's goals or objectives, and the recommended plan of

care. There are no notes by Loren Z. Clayman or even any indication that Ms. Nelson was seen by a physician that day.

96.     On September 23, 2013 Claudia L. Nelson returned to Loren Z. Clayman for her **fifth breast surgery**. On the day of her scheduled surgery Ms. Nelson filled out a patient questionnaire where she once again indicated, "I want size C & even." There is no indication that Loren Z. Clayman ever provided appropriate counseling regarding the size or structure of her breasts, their continued asymmetry, or answered any of her questions or addressed her concerns.

97.     There is no documented physical examination prior to the surgery of September 23, 2013, specifically no documented dimensional assessment of Ms. Nelson's breasts and no physical findings whatsoever. The History and Physical form in Loren Z. Clayman's chart does not contain a single mark that purports to be that of Loren Z. Clayman. There is no description of the patient's condition, and no indication of any measurements taken (preoperatively or post operatively). In fact, Loren Z. Clayman again failed to conduct a physical examination or see the patient at all before surgery. A nurse again recorded the patient's objective in the History and Physical, "DD → C."

98.     A single frontal view photograph of her condition was documented on September 23, 2013. This photograph again demonstrates extremely large breasts with significantly widened areolas, and no interval improvement in the implant position from prior photographs. The photograph does not suggest the presence of a left sided implant deflation. Despite this, Loren Z. Clayman had the patient sign an Authorization for and Consent to Surgery on September 23, 2013 for a bilateral replacement purportedly due to a left deflation before Loren Z. Clayman had the opportunity to see and inspect the implant intraoperatively.

26

99.    On September 23, 2013 Loren Z. Loren Z. Clayman performed breast surgery on Claudia L. Nelson **for the fifth time.** Loren Z. Clayman's pre-operative diagnosis listed in the Operative Report and the OR Record was "left deflation." Ms. Nelson did not have a left implant deflation. Loren Z. Clayman first cut into the left breast. The Operative Report indicates finding that the left implant was "found to have deflation (tissue/leak @ valve) and removed." The OR Record notes, "left tissue in valve."

100.    The right implant was found to be intact but also removed. Loren Z. Clayman replaced the previous 270 moderate profile saline implants with 200 cc high profile saline implants (Allergan Style 68). There is no indication in the Operative Report as to the amount of saline that was infused into either implant. In fact, Loren Z. Clayman failed to measure the amount of saline used to inflate the implants and overfilled them. The patient was put under intravenous sedation by a registered nurse with Versed, Demerol, and Ketamine. She could hear talking during the surgery and opened her eyes. She could feel pulling and tugging on her breasts.

101.    Loren Z. Clayman reported the left implant to be defective to Allergan prior to the surgery, without any actual evidence of defect and before he had the opportunity to inspect the implant intraoperatively.[8]  Loren Z. Clayman had Claudia L. Nelson sign the claim form before the surgery was performed, so that Loren Z. Clayman could be paid. Loren Z. Clayman subsequently filed a warranty claim to Allergan for the left implant that he removed on September 23, 2013. In the paperwork he completed and sent to Allergan, Loren Z. Clayman

---

[8] The Returned Goods Authorization (RGA) Checklist for Saline Devices (the claim form) was dated August 22, 2013, just after the August 19, 2013 consultation when Loren Z. Clayman told Ms. Nelson that she had an implant deflation, over a month before surgery, and received in Loren Z. Clayman's office via facsimile on that same day.

reported that there were "[p]articles in valve."[9] After examining the returned left implant, Allergan documented in a *Laboratory Analysis* report that there were no findings to substantiate a spontaneous saline implant deflation. Specifically, the Laboratory Analysis found,

> White particles were observed on the outer and inner surfaces of the implant. Creases were observed on the outer surface of the implant shell. Valve functioning was satisfactory. The analysis identified no openings in the implant shell.

Despite this, Allergan paid Loren Z. Clayman and Clayman PA the sum of $2,400 for the surgery of September 23, 2013.

102.    It does not appear that Ms. Nelson returned for her first post-operative follow up until October 7, 2013, two (2) weeks later. Ms. Nelson had a concern with an infection and a fever. There is no patient questionnaire and no subjective description of the patient's condition. The note in Loren Z. Clayman's chart merely states, "sutures out, taped. R.T.O. P.R.N." It is unclear who documented this note but there was no documentation of a physical examination by a physician. In fact, there is no record that Ms. Nelson was seen by a physician at all.

103.    Ms. Nelson returned to Loren Z. Clayman's office on January 14 2014 with concerns about the size of her breasts. She had wanted to make sure that the swelling had gone down. Her breasts were still much larger than she wanted. She was having problems with the weight of her breasts. One breast was larger than the other and they were misshapen. There is no record by Loren Z. Clayman or his staff regarding this visit. Specifically, there was no documentation of a physical examination by a physician, no differential diagnosis, and no indication of a discussion with the patient regarding her condition.

104.    Claudia L. Nelson returned a few additional times for botox but never followed up regarding her breasts.

---

[9] This was the same defect Loren Z. Clayman reported in virtually every warranty claim submitted to Allergan.

28

105.   During one or more of her visits to Clayman PA, Loren Z. Clayman examined the patient without a chaperone, made improper anatomical references, called her breasts "titties" or "tits," and "handled" her breasts with his body positioned behind and against hers while examining her as she faced a mirror.   Loren Z. Clayman did not wear gloves during the examinations.

106.   After September 29, 2015, Claudia L. Nelson left the care of Clayman Plastic Surgery.   After five (5) surgeries at the hands of Loren Z. Loren Z. Clayman, Ms. Nelson's implants remained much larger than she wants, contributing to neck and back pain, misshapen, asymmetrical, painful, and demonstrated a poor aesthetic appearance.   She has significant scarring and tissue damage.

## COUNT I – CLAYMAN DEFENDANTS' MEDICAL NEGLIGENCE

107.   Ms. Nelson re-alleges and incorporates by reference paragraphs 1 through 106.

108.   At all times material, Loren Z. Clayman owed Ms. Nelson a duty to exercise that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably careful physicians caring for a patient such as Ms. Nelson.

109.   On or between August 22, 2005 and September 29, 2015, Loren Z. Clayman and/or Clayman PA fell below the accepted and/or applicable standard of care in the treatment of Ms. Nelson in one or more of the following ways:

A.   Loren Z. Clayman's office notes throughout Ms. Nelson's care are grossly inadequate. None of the consultations or follow-up care contains any direct documentation by Loren Z. Clayman of their encounters.   It is unclear if there is any

direct documentation of assessment at any time by Loren Z. Clayman other than the operative report. At a minimum, documentation should reflect the patient's subjective concerns, a review of pertinent medical history, physical assessments including direct measurements, and a synopsis of findings leading to the surgical recommendation.

B.      In the records of Loren Z. Clayman, M.D., no discussion of implant size is documented.  Patients should have the opportunity to try different size implants and have a documented discussion regarding incision placement, tissue plane (pre/subpectoral), implant type, and implant size.  In Ms. Nelson' records, there are no such discussions and no such discussions took place.

C.      It is the generally accepted standard of care to take basic measurements of breast dimensions to appropriately guide and help select the optimal implant size for a given patient's breast and chest size.  There is no documentation of any breast measurements that would have helped a prudent surgeon pick an appropriately sized implant for this patient based on commonly accepted dimensional planning concepts.  There is no documented discussion regarding implant volume or evidence that there was an attempt to size the patient appropriately prior to proceeding with surgery.

D.      The office notes do not contain detailed physical examinations, detailed assessments/plans, or detailed documentation of the informed consent process.  Lack of appropriate documentation of follow-up visits is also a serious concern.  No physician assessments or specific plans of care are documented.

E.      Loren Z. Clayman failed to conduct adequate physical examinations of the patient and, on the day of surgery, failed to conduct any physical examination at all.

30

F.    The photographic documentation in Ms. Nelson' medical records is inadequate. At the very minimum, antero-posterior, lateral and oblique views should be obtained. Standardization of photo background, lighting, height, and distance is also important and considered standard of care as it allows not only a means of further objective assessment of the problem, but also a means of comparison over time. The few photos in the records are poorly reproduced "Polaroids" that only show a frontal view. The lack of adequate, standardized photographic documentation is very likely deliberate so that Loren Z. Clayman can continue to claim evidence of implant deflation when no such evidence exists.

G.    Loren Z. Clayman failed to correct the malposition asymmetry of the implants by placing the implants on a higher position on the chest wall. Throughout the course of care and treatment the malposition and asymmetry of the implants was the patient's primary concern. However, Loren Z. Clayman never adequately addressed this concern.    Rather than consider the patient's individual wishes and physical characteristics, Loren Z. Clayman choose to proceed with his universal, "one size fits all" approach: placement of a high profile, overfilled saline implant through an areolar incision. By failing to offer repositioning of the implants at some point during the course of her treatment, Loren Z. Clayman had little to no chance of meeting Ms. Nelson's reasonable expectations of improving the appearance of her breasts and giving her the appearance she desired.

H.    Instead of placing an implant of an appropriate size and projection in combination with repositioning the implants together with a standard mastopexy, the patient's condition was only exacerbated by subsequent surgeries that failed to address

31

the primary problem. By failing to include these options and perform these procedures in Ms. Nelson' treatment plan, she was "started down a road" of repetitive, ineffectual operations that could have been avoided had they been performed in combination with appropriately sized implants chosen using commonly accepted dimensional planning concepts. Instead, Loren Z. Clayman simply claimed deflation and replaced the implants, hoping for a better result but failing to provide the appropriate procedure to obtain the best possible result for the patient. Ms. Nelson's current complaints and persistent deformities were set in motion by poor preoperative counseling and assessment, as well as intraoperative execution from the time of the first surgery.

I.      In addition to the failure to perform the procedures noted above, Loren Z. Clayman exacerbated the patient's malpositioning, asymmetry, ptosis (sagging), and areolar size by placement of the overfilled, high profile implants. Prolonged malposition in the lower pole location and worsening ptosis with widened areola diameter resulted in excessive and irreversible expansion of the lower poles that could only be corrected through extensive internal capsule work or formal mastopexy procedure.

J.      Silicone gel implants should have been offered or at least considered after the first and subsequent surgeries. The benefits of switching to the silicone implants include a negligible risk of implant rupture and deflation, as well as a softer, less painful, and more natural feel without rippling compared to overfilled saline implants.

K.      Many of Ms. Nelson's problems can be traced to grossly overfilling the saline implants placed by Loren Z. Clayman. Overfilling saline implants frequently leads to excessive firmness or hardness of the entire breast and discomfort. It can additionally lead to capsular contracture. Ms. Nelson's implants were hard and uncomfortable which

appear to be directly related to filling the implants beyond their recommended capacity. Filling the implants greater than 10% maximum overfill is a recognized cause of failure of the valve, leakage, and ultimately deflation of the implant. Moreover, the sheer volume of augmentation used magnified the preexisting asymmetries of the breasts resulting in a worse appearance aesthetically.

L.    It is apparent that Loren Z. Clayman failed to measure and/or record the amount of saline used to inflate the implant(s) on each occasion. Instead, Loren Z. Clayman merely estimated the amount of saline used. Measuring the amount of saline that is used allows the physician to make appropriate adjustments if subsequent breast revision surgeries are made based on a quantitative analysis rather than merely guessing the amount of saline necessary to achieve symmetry and equal size. Here, that failure contributed to size disparity and grossly overfilling the saline implants. Overfilling a saline implant far beyond the manufacturer's recommendation causes excessive firmness and discomfort. Moreover, it frequently leads to sagging, malposition, and the creation of over-sized areola.

M.    Loren Z. Clayman used improper surgical technique in the initial breast augmentation surgery on October 12, 2005. Loren Z. Clayman entered the breasts through a superior areolar incision. Instead, he should have made the incision at the inferior aspect of the areola at the junction between the pigmented areolar skin and non-pigmented lower pole breast skin. Loren Z. Clayman's approach made it difficult to obtain adequate positioning and placement of the implants in the lower part of the breast and into the subpectoral plane. This contributed to the flat appearance at that part of the breast and contributes to greater risk to lactation potential and nipple sensation.

33

N.      Loren Z. Clayman improperly replaced implants bilaterally when only the allegedly deflated saline implant should have been replaced.  To the extent that the surgeries of July 13, 2010, June 3, 2013, and September 23, 2013 were indicated at all, they were indicated for the removal and replacement of only the implant suspected of deflation, not both implants.

O.      Although each subsequent operative report indicates that Loren Z. Clayman used the same incision each time, the photographs demonstrate several different scars on the breasts.  Loren Z. Clayman thus did not use the same incision each time and his statements about doing so are false.  The creation of additional scarring by using different incision sites was unnecessary.

P.      Loren Z. Clayman never adequately answered the patient's questions or provided appropriate information to obtain appropriate informed consent for the surgical procedures conducted.  Specifically:

(1).      The December 20, 2005 consent form was blank;

(2).      Loren Z. Clayman put in implants in the surgery of June 3, 2013 without the patient knowing or expecting this procedure and then falsely claiming that the patient had given consent during the surgery;

(3).      Loren Z. Clayman performed a mastopexy, or at least created scars of a mastopexy, on June 3, 2013 without the knowledge or consent of the patient; and

(4).      Loren Z. Clayman performed what he called a mini tummy-tuck surgery on Ms. Nelson on June 3, 2013 without the knowledge or

34

consent of the patient and then falsely claimed that the patient had given consent during surgery.

Q.      The type and quality of anesthesia provided to Ms. Nelson to perform the initial purported subpectoral breast augmentation and subsequent revisions was inadequate and improper.  Loren Z. Clayman, M.D. used the sedation protocol of ketamine and versed, which was administered by a registered nurse.  This led to significant under-sedation, which was evident in this case.  Intravenous sedation should be deep enough to adequately perform the procedure without the patient being able to hear conversations, recall the procedure, or remember waking up during the surgery.  Moreover, the anesthetic regimen continued to be administered despite its insufficiency and the adverse complications experienced by the patient.

R.      It is very likely that the implants were difficult to position under the pectoralis major muscle due to inadequate muscle paralysis.  Subpectoral implants may be placed under intravenous sedation provided that a proper pectoralis block is performed to adequately relax the muscle in combination with rib blocks for optimal pain control.  There is no evidence that this was performed during any of Ms. Nelson's surgeries, contributing further to her breast ptosis (sagging), asymmetry, and malpositioning. The inadequate intravenous sedation during Ms. Nelson's procedures more likely than not lead to an inadequate subpectoral plane and pocket development, and likely caused or contributed to the implants being malpositioned.

S.      General anesthesia should have been used, especially for the revisionary procedures because they were significantly more involved than her initial breast augmentation procedure and because of the history of inadequate sedation and adverse

reactions suffered by the patient. More likely than not, Loren Z. Clayman, M.D. took into account the limitations of intravenous sedation when he performed the revision surgeries, and there was no legitimate medical justification for choosing intravenous sedation administered by a registered nurse for these procedures. It appears that Loren Z. Clayman, M.D. chose this approach merely to control costs and in this particular case, as another excuse to avoid performing a formal mastopexy.

T.   Loren Z. Clayman improperly placed his desires, the prospect of direct financial gain for replacing allegedly defective implants, above the preferences and desires of the patient. Although the patient had good results with silicone implants, Loren Z. Clayman improperly insisted on the use of saline implants.

U.   The continued removal and replacement of Ms. Nelson's left implant was, at a minimum, an extreme deviation from the standard of care. It is unfathomable that the patient experienced the number of spontaneous implant rupture/deflations reported by Loren Z. Clayman. There was no photographic evidence of implant deflation, no patient complaints indicative of implant deflation, and no evidence of implant failure upon examination of the explanted saline devices by Allergan. Allergan's implant follow-up studies show spontaneous saline implant deflation rates of only approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year. At that rate of deflation, the odds against a patient experiencing three (3) spontaneous deflations, **all on the left side**, within about three (3) years that required replacement surgeries are astronomical. A review of the medical literature failed to reveal any published studies or relevant clinical information regarding multiple

36

spontaneous deflations in the same patient, which underscores how unlikely it would be for such a situation to occur.

V.    By repeatedly operating on this patient and claiming that her implants had deflated, Loren Z. Clayman placed her at an increased and unnecessary risk for surgical and anesthetic complications. These surgeries could have been avoided had Loren Z. Clayman used appropriately sized implants, placed them in an appropriate position, and provided other appropriate care as outlined above in conjunction with the first operation.

W.    Loren Z. Clayman concealed or intentionally misrepresented the cause of the patient's post-surgical results and subsequent complaints by claiming spontaneous deflations.

X.    Loren Z. Clayman ignored or failed to honor the requests of the patient to remove and not replace the implants and to obtain a breast size C in the surgery of July 13, 2010. Instead of complying with the patient's desires, Loren Z. Clayman insisted on doing it his way, resulting in breast size DDD.

Y.    Loren Z. Clayman ignored or failed to honor the requests of the patient to remove and not replace the implants and to obtain a breast size C in the surgery of June 3, 2013. Instead of complying with the patient's desires, Loren Z. Clayman insisted on doing it his way, resulting in breast size DD.

Z.    Loren Z. Clayman's attempt to perform a formal mastopexy was extremely poorly executed, failing to achieve any significant results and leading to additional, excessive scarring.

AA.    Loren Z. Clayman failed to act in a professional manner. Loren Z. Clayman examined the patient without a chaperone, made improper anatomical

37

references, called her breasts "titties" or "tits," and "handled" her breasts with his body positioned behind and against hers while examining her as she faced a mirror. These actions are entirely unprofessional and a breach of the standard of care.

110.    As a direct and proximate result of above noted breach or breaches of the standard of care by Loren Z. Clayman and/or Clayman PA, Ms. Nelson suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

111.    Furthermore, on one or more occasions Loren Z. Clayman and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Nelson and/or others that a saline implant that had been implanted in her body spontaneously deflated or ruptured; such fraud, concealment, or intentional misrepresentation caused Ms. Nelson to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of the applicable standard of care by Loren Z. Clayman and/or Clayman PA.

WHEREFORE, the Plaintiff, **CLAUDIA L. NELSON**, demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.** and **LOREN Z. CLAYMAN, M.D., P.A.** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.


## COUNT II – CLAYMAN DEFENDANTS' BREACH OF FIDUCIARY DUTY

112.    Ms. Nelson re-alleges and incorporates by reference paragraphs 1 through 106 and 109.

113.    On or between August 22, 2005 and September 29, 2015, Ms. Nelson was a patient of Loren Z. Clayman.  By virtue of the physician-patient relationship, Loren Z. Clayman and Clayman PA had a fiduciary duty to Ms. Nelson to not perform acts for his/their own pecuniary gain that were contrary to her welfare.

114.    Loren Z. Clayman and/or Clayman PA violated this fiduciary duty to Ms. Nelson in one or more of the following ways:

(a).    By recommending or insisting on Allergan saline implants based on their direct financial motivation rather than making appropriate recommendations based on the best interest of the patient.

(b).    By repeatedly claiming that her breast implants had deflated when in fact they had not.

(c).    By repeatedly operating on Ms. Nelson, which placed her at an increased risk for surgical and anesthetic complications, yet simply repeating the same procedures that were previously performed.

(d).    By repeatedly not performing the surgery that her physical condition actually required, as described above, in favor of surgery that took less time and skill, to save Loren Z. Clayman and/or Clayman PA time and money.

(e).    By repeatedly operating on her when he knew or should have known that he did not have the skill or competency to perform the surgeries within the standard of care.

(f).    By repeatedly operating on her so that Loren Z. Clayman and/or Clayman PA could recover a surgical fee from Allergan each time.

39

(g).   By performing surgery with inadequate anesthesia because it was cheaper, which in turn led to improper implant placement as well as increased pain, discomfort, and anxiety.

(h).   By performing surgery that was not requested by the patient, including a mastopexy, insertion of implants, and a tummy tuck.

(i).   By failing to honor, or ignoring, the requests of the patient to obtain breasts that were much smaller in size.

115.   Furthermore, on one or more occasions Loren Z. Clayman and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Nelson and/or others that a saline implant that had been implanted in her body had spontaneously deflated; such fraud, concealment, or intentional misrepresentation caused Ms. Nelson to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of Loren Z. Clayman's fiduciary duties to her.

116.   As a direct and proximate result of Loren Z. Clayman's and/or Clayman PA's breaches of fiduciary duties to Ms. Nelson, she suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff **CLAUDIA L. NELSON** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.,** and **LOREN Z. CLAYMAN, M.D., P.A.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

40

## COUNT III – CLAYMAN DEFENDANTS' VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

117.    Ms. Nelson re-alleges and incorporates by reference paragraphs 1 through 106.

118.    On one or more occasions between August 22, 2005 and September 29, 2015, Loren Z. Clayman and/or Clayman PA, engaged in one or more of the following acts:

(a).    Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements soliciting patients for "Dr. Clayman's Plastic Surgery Center & Miracle Spa" when there is no organized entity or even a registered fictitious name for such an entity or organization.

(b).    Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements that represented that Loren Z. Clayman had the experience, competence and finesse to produce extraordinary surgical results, when in fact such representations were false.

(c).    Represented to Ms. Nelson and/or others that a saline implant that had been implanted in her had spontaneously ruptured or deflated, when in fact it had not.

(d).    Represented to Ms. Nelson and/or others that Allergan saline implants were in the best interest of the patient, and the best choice for the patient to obtain the desired results, when, in fact, they were not.

(e).    Represented to Ms. Nelson that she had given consent to replacement of implants and a tummy tuck during the surgery when, in fact, she had not.

119.    The aforementioned acts of Loren Z. Clayman and/or Clayman PA were "[u]nfair methods of competition, unconscionable acts or practices, or unfair or deceptive practices" as contemplated by Section 501.204, *Florida Statutes*.

41

120.    Ms. Nelson is a "consumer" and Loren Z. Clayman and/or Clayman PA were and are engaged in "trade or commerce," as both terms are defined in Section 501.203 (7) and (8), Florida Statutes.

121.    As a direct and proximate result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. Nelson suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

122.    Furthermore, as a direct and proximate result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. Nelson spent monies in the amount of $4,000 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which caused her to need future medical care and incur related expenses to correct the damages done by said past medical and/or surgical care of Loren Z. Clayman and/or Clayman PA.

123.    As a result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. Nelson has retained or employed the undersigned law firm, and she has agreed to pay the firm a reasonable fee for its services in that regard.

WHEREFORE, the Plaintiff, CLAUDIA L. NELSON, seeks the following relief:

(a).    Judgment for damages against the Defendants, LOREN Z. CLAYMAN, M.D., and/or LOREN Z. CLAYMAN, M.D., P.A.

(b).    The court costs of this action, and attorney's fees pursuant to Sections 501.2105 and 501.211(2), *Florida Statutes*.

(c).    A declaratory judgment that one or more acts or practices of one or more of the

Defendants violated the *Florida Deceptive and Unfair Trade Practices Act*.

(d).     An order enjoining one or more of the Defendants from engaging in the above noted acts or practices.

(e).     The Plaintiff further demands a trial by jury on all issues so triable.

## COUNT IV – CLAYMAN DEFENDANTS' FRAUD

124.     Ms. Nelson re-alleges and incorporates by reference paragraphs 1 through 106.

125.     On one or more of the below occasions, Loren Z. Clayman and/or Clayman PA made the following false statements or representations, which were intended to conceal his inability to perform the breast augmentation procedures competently and within the standard of care, and which in fact misled Ms. Nelson and/or caused her to respond in the following ways to her detriment:

(a).     On May 21, 2010, Loren Z. Clayman told Ms. Nelson that her left breast implant was deflated and needed to be replaced.  In fact, Ms. Nelson did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the actual problems with her breasts.  These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

43

(b).    In a surgical estimate prepared on May 21, 2010, Loren Z. Clayman represented to Ms. Nelson that her left breast implant was deflated and needed to be replaced.  In fact, Ms. Nelson did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(c).    In the informed consent dated July 13, 2010, Loren Z. Clayman represented to Ms. Nelson that her left breast implant was deflated and needed to be replaced. In fact, Ms. Nelson did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

44

(d).    In the Operative Report and OR Record dated July 13, 2010, Loren Z. Clayman represented to Ms. Nelson that her left breast implant was deflated and needed to be replaced. In fact, Ms. Nelson did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(e).    After the July 13, 2010 surgery, Loren Z. Clayman made a warranty claim to Allergan regarding the left implant removed in the July 13, 2010 surgery indicating a defect of the implant. By having Ms. Nelson sign this claim form Loren Z. Clayman represented to her that her left implant was leaking and/or defective and needed to be replaced. In fact, Ms. Nelson did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had defective breast implants; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Nelson did not seek a

second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(f).    On January 15, 2013, Loren Z. Clayman told Ms. Nelson that her left breast implant was deflated and needed to be replaced. In fact, Ms. Nelson did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the actual problems with her breasts. These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(g).    In a surgical estimate prepared on January 15, 2013, Loren Z. Clayman represented to Ms. Nelson that her left breast implant was defective and needed to be replaced. In fact, Ms. Nelson did not have a defective left implant, an implant deflation, rupture, or leak, and he did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

46

(h).    In the informed consent dated June 3, 2013, Loren Z. Clayman represented to Ms. Nelson that her left breast implant was defective and needed to be replaced. In fact, Ms. Nelson did not have a defective implant, an implant deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(i).    In the Operative Report and OR Record dated June 3, 2013, Loren Z. Clayman represented to Ms. Nelson that her left breast implant was deflated and needed to be replaced. In fact, Ms. Nelson did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(j).    After the June 3, 2013 surgery, Loren Z. Clayman made a warranty claim to Allergan regarding the left implant removed in the June 3, 2013 surgery indicating a defect of the implant.  By having Ms. Nelson sign this claim form Loren Z. Clayman represented to her that her left implant was leaking and/or defective and needed to be replaced.  In fact, Ms. Nelson did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had defective breast implants; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(k).    On August 19, 2013, Loren Z. Clayman told Ms. Nelson that her left breast implant was deflated and needed to be replaced.  In fact, Ms. Nelson did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the actual problems with her breasts.  These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

48

(l).    In a surgical estimate prepared on August 19, 2013, Loren Z. Clayman represented to Ms. Nelson that her left breast implant was deflated and needed to be replaced.  In fact, Ms. Nelson did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(m).    In the informed consent dated September 23 2013, Loren Z. Clayman represented to Ms. Nelson that her left breast implant was deflated and needed to be replaced. In fact, Ms. Nelson did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(n).    In the Operative Report and OR Record dated September 23, 2013, Loren Z. Clayman represented to Ms. Nelson that her left breast implant was deflated and needed to be replaced. In fact, Ms. Nelson did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(o).    After the September 23, 2013 surgery, Loren Z. Clayman made a warranty claim to Allergan regarding the left implant removed in the September 23, 2013 surgery indicating a defect of the implant. By having Ms. Nelson sign this claim form Loren Z. Clayman represented to her that her left implant was leaking and/or defective and needed to be replaced. In fact, Ms. Nelson did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Nelson to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had defective breast implants; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms.

50

Nelson did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(p).    On August 22, 2005 and at each visit with his office thereafter, Loren Z. Clayman represented to Ms. Nelson that he was a competent plastic surgeon who could perform breast augmentation revision and related procedures in a reasonably competent manner that was within the standard of care.  This representation was false because he was not in fact reasonably competent to perform the requested procedures within the standard of care.  This representation caused Ms. Nelson to choose Loren Z. Clayman for breast surgery as opposed to other plastic surgeons.

(q).    On August 22, 2005 and at each visit thereafter, Loren Z. Clayman represented that he knew the appearance that Ms. Nelson wanted for her breasts, and that he could achieve that appearance through the planned surgery.  In fact, whether Loren Z. Clayman knew what appearance she desired or not, he did not have the ability or intention to perform the procedures necessary to provide her with the desired appearance (i.e. addressing her complaints of sagging and asymmetry).  This representation caused Ms. Nelson to choose Loren Z. Clayman for breast surgery as opposed to other plastic surgeons who would have been able to provide her with the desired appearance.

126.    As a result of the above false statements or representations, Loren Z. Clayman, and/or Clayman PA were able to continue collecting money in relation to the medical and surgical care of Ms. Nelson, Ms. Nelson did not seek a second opinion from another plastic surgeon, and/or Ms. Nelson delayed seeking legal counsel for potential medical negligence.

127.    As a direct and proximate result of the above noted false statements or representations of Loren Z. Clayman and/or employees or agents of Clayman PA, Ms. Nelson

51

suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

128.     Furthermore, as a direct and proximate result of the above noted false statements or representations by Loren Z. Clayman and/or employees or agents of Clayman PA, Ms. Nelson spent monies in the amount of $4,000 or more for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses for medical and surgical care to correct the damage done by Loren Z. Clayman and/or Clayman PA.

WHEREFORE, the Plaintiff **CLAUDIA L. NELSON** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.** and **LOREN Z. CLAYMAN, M.D., P.A.** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT V – CLAYMAN DEFENDANTS AND ALLERGAN'S CONSPIRACY TO COMMIT FRAUD AND/OR BREACH OF FIDUCIARY DUTY

129.     Ms. Nelson re-alleges and incorporates by reference paragraphs 1 through 106.

130.     On or before August 22, 2005, Loren Z. Clayman and/or Clayman PA entered into an agreement with Allergan to commit fraud and/or breach of fiduciary duty.

52

131.    Ms. Nelson re-alleges and incorporates by reference paragraphs 113 through 116 as the allegations of conduct by Loren Z. Clayman and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Loren Z. Clayman and/or Clayman PA to Ms. Nelson.

132.    Ms. Nelson re-alleges and incorporates by reference paragraphs 125 through 128 as the allegations of fraud upon Ms. Nelson committed by Loren Z. Clayman and/or Clayman PA.

133.    Allergan committed one or more of the following overt acts in furtherance of the conspiracy to commit fraud and/or breach of fiduciary duty:

(a).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Nelson on October 12, 2005, and which Loren Z. Clayman surgically removed on July 13, 2010, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on October 12, 2005, and explanted from Ms. Nelson by Loren Z. Clayman on July 13, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the July 13, 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(b).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Nelson on July 13, 2010, and which Loren Z. Clayman surgically removed on June 3, 2013, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on October 12, 2005, and explanted from Ms. Nelson by Loren Z. Clayman on July 13, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the July 13, 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on July 13, 2010, and explanted from Ms. Nelson by Loren Z. Clayman on June 3, 2013, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the June 3, 2013 surgery was not necessary as a result of a failed breast implant;

(3).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(4).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(c).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Nelson on June 3,

54

2013, and which Loren Z. Clayman surgically removed on September 23, 2013, despite the following:

(1). Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on October 12, 2005, and explanted from Ms. Nelson by Loren Z. Clayman on July 13, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the July 13, 2010 surgery was not necessary as a result of a failed breast implant;

(2). Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on July 13, 2010, and explanted from Ms. Nelson by Loren Z. Clayman on June 3, 2013, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the June 3, 2013 surgery was not necessary as a result of a failed breast implant;

(3) Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on June 3, 2013, and explanted from Ms. Nelson by Loren Z. Clayman on September 23, 2013, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the September 23, 2013 surgery was not necessary as a result of a failed breast implant;

(4). Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(5). The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(d). Continuing to sell saline filled breast implants to Loren Z. Clayman and/or Clayman PA after August 22, 2005, despite the following:

(1). Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms.

Nelson on October 12, 2005, and explanted from Ms. Nelson by Loren Z. Clayman on July 13, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the July 13, 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on July 13, 2010, and explanted from Ms. Nelson by Loren Z. Clayman on June 3, 2013, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the June 3, 2013 surgery was not necessary as a result of a failed breast implant;

(3)    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on June 3, 2013, and explanted from Ms. Nelson by Loren Z. Clayman on September 23, 2013, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the September 23, 2013 surgery was not necessary as a result of a failed breast implant;

(4).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(5).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(e).    Failing to report Loren Z. Clayman, and/or Clayman PA to the

appropriate authorities after August 22, 2005, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on October 12, 2005, and explanted from Ms. Nelson by Loren Z. Clayman on July 13, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the July 13, 2010 surgery was not necessary as a result of a failed breast implant;

56

(2).   Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on July 13, 2010, and explanted from Ms. Nelson by Loren Z. Clayman on June 3, 2013, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the June 3, 2013 surgery was not necessary as a result of a failed breast implant;

(3)   Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on June 3, 2013, and explanted from Ms. Nelson by Loren Z. Clayman on September 23, 2013, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the September 23, 2013 surgery was not necessary as a result of a failed breast implant;

(4).   Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(5).   The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(f).   After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Nelson, failing to conduct an appropriate and timely investigation into the cause of the reported failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations.

(g).   After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Nelson, failing to report to the FDA in a substantially complete form and timely manner each failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations.

134. As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also by Allergan, Ms. Nelson suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

135. Furthermore, as a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also by Allergan, Ms. Nelson has spent monies in the amount of $4,000 or more, for medical and/or surgical care by Loren Z. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff **CLAUDIA L. NELSON** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VI – ALLERGAN AIDING AND ABETTING FRAUD
## AND/OR BREACH OF FIDUCIARY DUTY

136.    Ms. Nelson re-alleges and incorporates by reference paragraphs 1 through 106.

137.    Ms. Nelson re-alleges and incorporates by reference paragraphs 113 through 116 as the allegations of conduct by Loren Z. Clayman, and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Loren Z. Clayman and/or Clayman PA to Ms. Nelson.

138.    Ms. Nelson re-alleges and incorporates by reference paragraphs 125 through 128 as the allegations of fraud upon Ms. Nelson committed by Loren Z. Clayman and/or Clayman PA.

139.    Allergan, through its employees or agents, knew that Loren Z. Clayman and/or Clayman PA, was committing fraud upon Ms. Nelson, and/or breaching a fiduciary duty owed to Ms. Nelson, due to the following:

(a).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on October 12, 2005, and explanted from Ms. Nelson by Loren Z. Clayman on July 13, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the July 13, 2010 surgery was not necessary as a result of a failed breast implant;

(b).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on July 13, 2010, and explanted from Ms. Nelson by Loren Z. Clayman on June 3, 2013, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the June 3, 2013 surgery was not necessary as a result of a failed breast implant;

(c).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Nelson on June 3, 2013, and explanted from Ms. Nelson by Loren Z. Clayman on September 23, 2013, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical

59

intervention," and, thus, that the September 23, 2013 surgery was not necessary as a result of a failed breast implant;

(d).     Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(e).     The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

140.     Despite the aforesaid knowledge of Allergan through its employees or agents, Allergan provided substantial assistance to Loren Z. Clayman and/or Clayman PA in committing fraud against Ms. Nelson, and/or breaching a fiduciary duty owed to Ms. Nelson, in either or both of the following ways:

(a).     Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Nelson on October 12, 2005, and which Loren Z. Clayman surgically removed on July 13, 2010.

(b).     Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant placed into Ms. Nelson by Loren Z. Clayman on July 13, 2010, and which Loren Z. Clayman surgically removed June 3, 2013;

(c).     Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Nelson on June 3, 2013, and which Loren Z. Clayman surgically removed on September 23, 2013.

(d). Continuing to sell saline filled breast implants to Loren Z. Clayman, and/or Clayman PA after August 22, 2005; and/or

(e). Failing to report Loren Z. Clayman and/or Clayman PA to the appropriate authorities after August 22, 2005.

(f). After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Nelson, failing to conduct an appropriate and timely investigation into the cause of the reported failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations; and/or

(g). After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Nelson, failing to report to the FDA in a substantially complete form and timely manner each failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations.

141. As a direct and proximate result of the substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. Nelson suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

142. Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. Nelson has spent monies in the amount of $4,000 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff **CLAUDIA L. NELSON** demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VII – ALLERGAN'S STRICT LIABILITY FOR DEFECTIVE PRODUCTS

143.    Ms. Nelson re-alleges and incorporates by reference paragraphs 1 through 106.

144.    Allergan designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants:  right and left McGhan Style 68 High Profile 350 cc saline filled breast implants with serial numbers 11566741 and 11566734, respectively, that were implanted into Ms. Nelson on October 12, 2005, and explanted from Ms. Nelson on July 13, 2010; right and left Natrelle Style 68 High Profile 320 cc saline filled breast implants with serial numbers 14651327 and 15110093, respectively, that were implanted into Ms. Nelson on July 13, 2010, and explanted from Ms. Nelson on June 3, 2013; right and left Natrelle Style 68 moderate profile 270 cc saline filled breast implants with serial numbers 18437113 and 18437116, respectively that were implanted into Ms. Nelson on June 3, 2013, and explanted from Ms. Nelson on September 23, 2013; right and left Natrelle Style 68 high profile 200 cc saline implants with serial numbers 12880230 and 12880214, respectively that were implanted into Ms. Nelson on September 23, 2013 and remain inside her body.

145.    At all times material, Allergan expected the aforesaid saline filled breast implants to reach, and either or both did in fact reach, consumers in the State of Florida, including Ms. Nelson, without substantial changes in the condition in which they were sold or distributed.

146.    At all times material, one or more of the aforesaid saline filled breast implants were being used in the manner intended, or based upon all of the circumstances reasonably expected, by Allergan.

147.    At all times material, one or more of the aforesaid saline filled breast implants were in fact defective and in an unreasonably dangerous condition at the time they were placed into the stream of commerce, and when put to their reasonably anticipated use, in one or more of the following ways:

a.    Design

(1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

(3).    Prior to the time that the implants identified above were sold, distributed, and/or placed into the stream of commerce, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

63

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    Manufacture

One or more of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    Warning

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

148.    The defective condition of one or both of the aforesaid saline filled breast implants subjected patients receiving the breast implants to infection or rupture/deflation, which exceeded the benefits of the products, and for which safer products were available.    This

64

defective condition made one or both pairs of the aforesaid saline filled breast implants unreasonably dangerous when put to use as intended or reasonably expected by Allergan.

149. The defective condition of one or both of the aforesaid saline filled breast implants directly caused or contributed to cause Ms. Nelson to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff, **CLAUDIA L. NELSON**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VIII – ALLERGAN'S PRODUCT NEGLIGENCE

150. Ms. Nelson re-alleges and incorporates by reference paragraphs 1 through 106.

151. Allergan was and is the entity that designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants: right and left McGhan Style 68 High Profile 350 cc saline filled breast implants with serial numbers 11566741 and 11566734, respectively, that were implanted into Ms. Nelson on October 12, 2005, and explanted from Ms. Nelson on July 13, 2010; right and left Natrelle Style 68 High Profile 320 cc saline filled breast implants with serial numbers 14651327 and 15110093, respectively, that were implanted into Ms. Nelson on July 13, 2010, and explanted from Ms. Nelson on June 3, 2013;

65

right and left Natrelle Style 68 moderate profile 270 cc saline filled breast implants with serial numbers 18437113 and 18437116, respectively that were implanted into Ms. Nelson on June 3, 2013, and explanted from Ms. Nelson on September 23, 2013; right and left Natrelle Style 68 high profile 200 cc saline implants with serial numbers 12880230 and 12880214, respectively that were implanted into Ms. Nelson on September 23, 2013 and remain inside her body. Accordingly, at all times material Allergan owed one of more of the following duties to the patients who received the implants in surgeries:

(a). to properly design, assemble, and manufacture the aforesaid Natrelle saline filled breast implants so that none of them created an unreasonable risk of harm, bodily injury, or death to their users or consumers;

(b). to provide labels and packaging materials that adequately warned implanting surgeons and the using public of the risks and dangers associated with the aforesaid Allergan Natrelle saline filled breast implants, including but not limited to the risk of their valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents, as well as the risk of the valves allowing saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and/or

(c). to conduct adequate testing on the aforesaid Natrelle saline filled implants before releasing them into the stream of commerce to ensure that they were reasonably safe for their intended use.

152. On or before August 22, 2005 Allergan knew or should have known that the aforesaid Natrelle saline filled breast implants posed an unreasonable risk of harm, bodily injury, or death to its users, the patients who had them implanted into them.

66

153. Allergan breached the duties it owed to its users, the patients who had Natrelle saline filled breast implants implanted into them, in one or more of the following ways:

a.  Design

(1).  One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).  One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

(3).  Prior to the time that the implants identified above were sold, distributed and/or placed into the stream of commerce, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).  The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.  Manufacture

One or both of the aforesaid saline filled breast implants was defectively manufactured such that

(1).  One or more of the aforesaid saline filled breast implants was manufactured such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was manufactured such that the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    Warning

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

154.    Allergan's breach of the duty or duties it owed to users of Natrelle saline filled breast implants, including Ms. Nelson, directly caused or contributed to cause Ms. Nelson to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff CLAUDIA L. NELSON demands judgment for damages against the Defendants, ALLERGAN, INC., ALLERGAN SALES, LLC, and ALLERGAN USA, INC., together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT IX – CONSORTIUM CLAIM

155.   Mr. Nelson re-alleges and incorporates by reference paragraphs 1 through 154.

156.   Mr. Nelson was and is the lawful wedded husband of Ms. Nelson, and did and does reside with her.

157.   As a direct and proximate result of the above described wrongful conduct of the Clayman Defendants and Allergan, Mr. Nelson has lost the care, comfort, and companionship of Ms. Nelson, and he will suffer these losses in the future.

WHEREFORE, the Plaintiff **RONALD D. NELSON** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## CERTIFICATE OF REASONABLE INVESTIGATION

The undersigned counsel hereby certifies that he has made a reasonable investigation as permitted by the circumstances which have given rise to a good faith belief that grounds exist for the bringing of this action.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:   (904) 632-2424
Facsimile:   (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: aashley@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiffs

/s/ Leslie A. Goller
**Leslie A. Goller, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:    (904) 632-2424
Facsimile:    (904) 632-5049
Primary Email: lgoller@terrellhogan.com
Secondary Email: lkipp@terrellhogan.com
Florida Bar No.: 0393932
Attorney for the Plaintiffs